Good morning, Your Honors. May it please the Court. I'm Jeremy Horowitz with the EEOC. A reasonable jury could find, based on the unique facts of this case, that the harassment at issue meets the standard for a hostile work environment claim under the ADA. In order to make out a claim of disability-based supervisory harassment, a plaintiff needs to show that they are disabled, they were harassed because of that disability, and the harassment is abusive, in order to alter the terms or conditions of their employment and create an abusive environment. The things that make that harassment worse that the cases have found include that it comes from a supervisor, that it's humiliating, that it's physically threatening, and that it unreasonably interferes with court. And it's undisputed from the Supreme Court and from this Court that a single incident, even if it's a single incident, if it's sufficiently severe, it can state a claim for a hostile work environment. Given the full context of this case and how the harassment arose and the nature of the harassment, a reasonable jury could find that that standard was met here. It arose in the early days of the COVID-19 pandemic when not much was known about COVID-19, but what was known was that somebody like Mr. Calzada, who had asthma, was more susceptible to getting COVID-19 and more likely to get a severe or even a fatal case if he did come down with it. He also knew that because he worked in a pharmacy, he was going to be interacting with infected people, and he knew that people were starting to come to the pharmacy complaining of symptoms that were consistent with COVID-19, and in at least one case, somebody came from California where the first case had already been positively identified. So it's under that scenario where he asked for the reasonable accommodation of being allowed to wear a mask based on his asthma and his heightened risk of getting COVID-19. In response, he was told that they didn't allow wearing masks because they didn't want to scare customers, even though this was a policy that, as the District Court found, was contrary, plainly contrary, to the health and safety of the employees. He was also... Wait a minute. I mean, the reality is they followed the policy that the company had handed down on one day. They changed it the next day or within two days, and in the meeting that they had, Ms. Navarette said she looked at the CDC guidelines, which then said healthy people don't need masks, and they had the pharmacy policy of not wearing masks, not to scare customers, et cetera, and so forth. I mean, so how much of this was known by them at that time over a 48, 72-hour period I think is a little bit maybe overstated. I mean, What's your best case that this one incident could rise to a hostile work environment under our precedent? I take your point, Your Honor. First, if I can just respond a little bit to your characterization. This case isn't about the failure to afford an accommodation. The case is about the harassment that he experienced in response to seeking an accommodation, and I also want to make clear that... Well, but they also say in that call, in the recorded conversation, that he was trying to enforce his own policy. He wasn't seeking an accommodation. He was trying to enforce his own policy, and then they talk about the attitude, and I realize there may be some dispute about whether this was about attitude or the accommodation or what have you, but... Right. So in terms of the attitude, I mean, that's sort of a red herring in this case, Your Honor, because even if an employer were able to say, there's nothing objectively offensive about your seeking an accommodation, but I just don't like the tone, and then an employer could always harass somebody who sought an accommodation just because they claimed they didn't like the tone. That would severely undercut what the ADA protects, but turning back to Your Honor's earlier question, the... Well, first, also, I wanted to talk about this idea that the general public had been told by the CDC not to wear masks. That was because the CDC wanted to preserve the PPE for frontline healthcare workers, but Mr. Calzada was a frontline healthcare worker. He was working in a pharmacy dealing face-to-face with infected people, so he was exactly the sort of person that PPE was supposed to be. I don't know if it was that clarified within the first week or two of the pandemic. Well, I'm just referring to that text that the CDC sent out. They specifically said they want to preserve PPE for individuals who are working as healthcare, who work in the healthcare field. But getting back to Your Honor's initial question about the cases saying that this can rise to that level, the question is, under the totality of the circumstances, as experienced by an individual who is the target of the harassment, could it be severe enough to establish, to change the terms and conditions of employment? And so it's important to remember that in Harris, the Supreme Court said, when you're looking at these cases of hostile work environments, they often contain these egregious fact patterns, but those egregious patterns don't set the boundaries, the bottom limit for liability. They merely establish that liability exists in those cases. And this court said the same thing in the Wooten case. So I just wanted to emphasize that. So the cases that we rely on, I mean, there's nothing specifically on all fours with this, because the facts here are fairly extreme. There's the idea of the worldwide pandemic, the fear attendant with that, the request that seemed like not sort of a regular accommodation request, but actually like a literal matter of life and death. But doesn't that help the employer also? I mean, it kind of cuts both ways. They didn't know what to do, and they are trying to protect their business, and they're trying to serve their customers, and nobody knew what to do. So how does that just militate in favor of the plaintiff here? Because the question here isn't what accommodation was provided. The question is whether he was harassed for making the request. Well, but I mean, you say, okay, it's this great extreme circumstance and this and that and the other. Well, they're operating under the same circumstance, and they've got an employee that basically comes in and says, I'm doing it my way. I don't care what you say. That's what they say in the conversation with him. They say a number of things in the conversation with him, Your Honor. They do. But it's not just you're trying to do what you're – I mean, he's asking for an accommodation that he thinks is going to help save his health and possibly his life. And the response is to tell him that – is to subject him to an intimidating verbal attack, the point of which was to be threatening. Those are the words of Mr. Mosher, the person who was most responsible for the harassment here. He specifically said the point of which was to be threatening. He was called a disrespectful, stupid little kid. I mean, this isn't getting to whether or not he can wear a mask. He was called a disrespectful, stupid little kid. He was told he was as stupid as he can be. He was told he was behaving like a 5-year-old child. He was told that he was – he needed to be disciplined and controlled. He was told that as long as he acted like – No, he was told his attitude needed to be disciplined and controlled. And he was arguing with them also in the conversation. So we've got cases where supervisors berated employees, threw things at them, those kinds of things, under single incidents, or a sustained berating, you know, goes on. And we say it's not enough for a hostile work environment. But those cases are very different, Your Honor. They involve sophisticated individuals who are objecting to how they – how their work is being assessed. Where is your case that supports that we have some sliding scale for sophistication of parties or the age differential? I mean, that's from the Seventh Circuit, the – Where's your Fifth Circuit case? There isn't a Fifth Circuit case talking about that specifically, but they do talk about all of the – how the harassment can be experienced by an individual in the plaintiff's position, by the target of the harassment. And as part of that, somebody who is young and unsophisticated and hasn't had a paying job before this, they could feel a lot more vulnerable, as the district court pointed out. I also want to note this Court's decision in the Clark case, which does make that distinction between when the harassment is based on somebody's job performance and when the harassment contains ad hominem attacks, not based on performance, that include threats and include cursing. The Court explained in Clark, this Court explained that under Flowers, a hostile work environment had been established with those additional elements, and Credure lacked those additional elements, and so a hostile work environment was not – was not established. So this Court does look at those factors as being things that make things worse for the individual. I also note that in addition to the discipline and control, he was also told he was being treated like a little kid. Well, so what's the limiting principle on this? Is every time – every time a boss chews out a subordinate, even in the most rude, ill-advised tone with verbiage such as what you've recited here, that creates an actionable event? Is that what we're talking about? I mean, there's all kinds of workplaces around here, you know, shipyards, people that work out on the rigs where criticism from superiors in the workplace, even criticism of this nature, isn't all that uncommon. So where do we draw the line? Are we just creating an action that will happen every time a superior chews out an employee? Absolutely not, Your Honor. I mean, that really is the difference between Credure and Flowers, where they're chewed out in these extremely personal terms. That's subjective, though. That's subjective, right? Someone gets offended by certain words that are used. Other people, whether we want to say they're thick-skinned or whether they're less sensitive or whatever, they accept it differently. I mean, that is a question for the jury in that case. Is the harassment significant enough that a reasonable person could find that the terms—well, both as an objective matter and as a subjective matter—that the terms and conditions of their employment had changed, had been irrevocably altered? But that's not a limiting principle, is it? Limiting—I mean, there are a number of limiting principles that courts have found in not directly analogous situations because, again, this is a fairly extreme fact pattern, the life-or-death request being made—life-or-death accommodation request being made and the response being this attempt to intimidate and harass. But courts could look at, was the attempt—was the intent to intimidate and harass? I didn't notice in the record, was there any history or factual background other than the incident as described in connection with the desire to wear a mask? Was there any other prior history of criticism or unwarranted comments of the sort that you've highlighted? No, Your Honor, other than the fact that they sent him home twice without pay when he sought to wear a mask. That's all part of the facts of this incident. Yes. Well, that leads up to this incident, exactly. But yes, no, there was nothing previously on either side. I mean, he had never acted discourteously or disrespectfully before, and he did not say that there was anything about—I mean, it really was—it really all arose based on COVID-19 and based on the fear attendant with COVID-19. So in terms of—Your Honor's asked about limiting principles. I mean, there are a number. Did it come from a supervisor? Was it physically threatening? Was it intimidating? Was it—did it include threats of termination? Was he cursed? Was he mocked and taunted? I mean, all of this, it can go towards finding that, yes, given the situation, given that he was making a reasonable accommodation request and this was the response, a reasonable jury could find that, yes, that altered the terms of his employment. I take Your Honor's point that you're worried about sort of opening the door to a number of claims, but it's—I mean, just because this is such a unique circumstance, it's really hard to imagine a number of other cases presenting similar facts here—sorry, similar facts to what's at issue here. If I could—let's see. I also wanted to talk while I can about the constructive discharge claim. The district court found that—the test for a constructive discharge claim first is whether a reasonable person in the plaintiff's position would have felt compelled to quit. And the district court found that, yes, a reasonable jury could absolutely find that, but it nevertheless felt constrained to grant summary judgment. But the court was correct insofar as a reasonable jury could find that somebody in Mr. Calzada's position would feel compelled to quit, and therefore, the constructive discharge claim should survive as well. I do want to talk briefly about the matter of whether or not an affirmative defense was established by defendant. There's been—because defendant mischaracterized the law in their brief, there's a little bit of maybe ambiguity here that I wanted to clear up. First, in order to establish an affirmative defense to a hostile work environment claim, an employer has the responsibility to prove both prongs of the affirmative defense. The first is that they took adequate preventive and corrective measures to avoid harassment in the first place, or to correct it after it's occurred. And second, that the employee acted unreasonably in failing to take advantage of those measures, or somehow acted unreasonably otherwise in failing to avoid harm. In this case, U.S. Drug Mart hasn't satisfied either of those prongs. They can't show that they prevented harassment in any way, because their COO testified they had no adequate anti-discrimination policy, and certainly no training for supervisors. As this Court held in Pullen and in Bow Brothers, that's not sufficient to establish that prong. Second, in terms of the response, they claim that because Ms. Navarette printed out some anger management tips, that somehow constituted remedial action. But that is a far cry from the sort of remedial action this Court has held in Bow Brothers. It's necessary to establish that part. Was he his supervisor, or was she his supervisor? He reported directly to Mr. Paschal, the COO. So they were sort of both supervisors, but neither had authority over the other. She was the store manager. He was the head pharmacist in charge. But it's stated . . . But Mr. Mosher, when he's talking to the plaintiff, he says, if it was up to me, you know, I'd fire you. But it's not up to me. It's up to her. So was she his supervisor? She was not. Mr. Paschal makes that clear in his deposition testimony, that he says, I guess you could say I was his supervisor. Mosher reported to me. Certainly wasn't. No, I'm talking about the plaintiff. Who did he report to? Oh, I'm sorry. The plaintiff reported to both of them. They were both his supervisors. But he, Mr. Mosher said, I would, if it were up to me, I'd fire you, but it's not up to me. He did say that. It's unclear from the record. I mean, it's clear that both of them were involved in the hiring process. Presumably, they were both involved in the firing process as well. But he was putting that on her. But I think he was trying to threaten him additionally by saying you should have been fired for having brought up this mask request. I see I'm out of time, but I appreciate the opportunity to answer any other questions your honors have before I. We may have more for you on rebuttal. Fantastic. Thank you, your honor. May it please the court. My name is Cassie Dallas, and I'm here today on behalf of U.S. District Court to confirm the dismissal of the EEOC's hostile work environment claim for two reasons. First, under this circuit's precedent, the district court correctly held that the isolated incident between Mr. Calzada and his supervisors was not extremely serious and therefore could not support a hostile work environment claim. And second, departing a little bit from the district court's decision and reasoning, on this record and viewing the heated exchange between Mr. Calzada and his supervisors in the light most favorable to the plaintiff, there was no evidence to support the second and third elements of a hostile work environment claim. That is, the EEOC did not raise a fact issue that the complaint of harassment, Mr. Mosher's comments calling Mr. Calzada a stupid kid and speaking to him in a verbally intimidating manner were based on Mr. Calzada's disability or that the harassment affected a term, condition, or privilege of his employment. The court should also affirm the dismissal of the EEOC's constructive discharge claim because constructive discharge requires a greater degree of harassment than is required to establish a hostile work environment claim. Because the evidence didn't support the hostile work environment claim, the constructive discharge claim necessarily failed. The EEOC suggests that uncertainty and anxiety around the novel coronavirus in the early days of the COVID-19 pandemic coupled with Mr. Calzada's harassment disability and his subjective beliefs about what exposure might do are sufficient justification to alter what is required to prove hostile work environment. But the protections of the ADA and Title VII, to the extent that the cases are based on Title VII authority, are not intended to make actionable every instance of abusive language in the workplace. That's not what they're there for. The recurring theme across the court's hostile work environment case law is that teasing, offhand comments, isolated incidents, unless extremely serious, will not amount to discriminatory changes in the terms and conditions of employment. Well, flip side of what we were asking counsel opposite, I mean, where do we draw the line? Here you've got a supervisor, we'll just assume Mosher is his supervisor, calling him a stupid kid, saying he would fire his ass, saying he would send him packing, saying he deserved to be spanked. I mean, is that not a serious, and you're talking about a disability where clearly he's talking about trying to protect himself from getting COVID. And at that point, people didn't know how serious it was going to be. People didn't know how serious it would be for age differentials or what have you. And so, how is that not serious enough to rise to the level of a hostile work environment? Your Honor, in the handful of cases where this court has found that an isolated incident did, was sufficiently serious to create a hostile work environment, the fact pattern involved extremely derogatory racial epithets, extremely abusive behavior of an HIV positive individual over an extended period of time, and, um, here it's an asthmatic kid. Your Honor, that's correct. But there is no dispute that this was a single incident, a conversation that lasted a handful of minutes and that in the wake of it, Mr Calzado was accommodated in exactly the way that he requested to be accommodated. He was permitted to wear a mask. On top of that, they closed the lobby of the pharmacy to customers. They, um, they changed their entire policy around mask wearing gloves and having, you know, the public interact with the individuals in the pharmacy, the staff in the pharmacy. So, I think when you contextualize objectively what happened here, which this hostile work environment claim requires not more than just Mr Calzado's subjective perception of a discriminatory, um, disability-based discrimination or harassment, it requires that from an objective standpoint, somebody, a reasonable person would have perceived the entire thing as an extremely serious work-altering incident. Well, so it's true. They started out the conversation. Ms Navarrete and Calzado talked about masks and masking and how she had looked at CDC guidance and how they had changed and now he could wear one. They were talking about various things on the recording, but at some point Mosher says, well, you can either come in and do what we say or you can quit. Isn't that pretty serious? You know, Mr Mosher admitted in the aftermath of, in the immediate aftermath of this incident that he, things got a little too heated. Yeah, he says he basically was acting like a kid himself. And so you've got a, you've I mean, what do you, what do you do with that? I think what the court, um, the principle applied in, in, you know, for example, Flowers or the Wontow case, um, out of this court, that I think what the, those more isolated, extremely serious cases have that differentiates them from this case is, is that it is, is that it goes to, the insults go to the heart of the individual's identity, um, and are, are abusive, um, attacks on that individual's identity. There is nothing about this conversation. You were talking about earlier about where single incidents have worked, racial epithets perhaps were used, or at least racially conscious, uh, abuse was involved. You seem to be creating something of a sliding scale of what person's identity is, can be defended, uh, through EEOC, uh, through a single incident. If it's, if it's race, if it's, if it's, if it's a person's perception of how deathly ill he could be and the uncertainty of the early days of COVID, that's not good enough, and, and, you know, limiting principles, a phrase gets tossed around, it's very important to us, but I, I don't see it so much as limiting principle as you, you're just categorizing what is the nature of the person's, how can you discriminate against this person? You can only discriminate against this person on the facts of this case based on his disability, as you can discriminate against this person though based on race, and that's more serious. Is that what we're talking about? I think either type of harassment is, could be serious, but what I think is unique about this case is that the court has an entire transcript of all the words that were said. None of the words that were said have to do, you know, have to be, are a criticism about Mr. Calzada having asthma or really about his desire for an accommodation. I think acting like a kid, you're too scared of getting sick is what that seems to me to mean when he said that, and I think there's a fair amount of implication in what was being said in that exchange that is focusing on his fear of getting sick. Your Honor, Mr. Mosher is saying that he, that he is being a kid in the way that he went about asking for an accommodation, and I don't think it is, as the EEOC suggests, harassing for an employer to expect an employee to, you know, follow a reasonable and, you know, respectful protocol in seeking an accommodation. Mr. Calzada was certainly Sounds like a fact dispute to me. What was meant by Mr. Mosher's language? Your Honor, we have what he, we have what Mr. Mosher said, and I think that the reason that district court ultimately concluded that it was not, that the isolated incident of verbal harassment was not extremely serious was because this particular case is much more like, much more like this court's precedent and analysis, and the Saketku case that we cite, the Septimus case that we cite in our brief, and the Kumar and Thompson versus Microsoft cases, where, you know, there is a disagreement, there is a heated exchange, an exchange where emotions are high, and then it's done. That's a little bit of a different argument. In other words, that sets aside, is this conversation about accommodation because of disability or about attitude, and it just telescopes out and says, whatever it is, it's not severe enough to be characterized. That is a slightly different degree of argument. What do we make of counsel opposite's assertion that we should consider the age of the parties involved? And it's almost like the eggshell skull plaintiff, I guess. I mean, how much does the plaintiff's sort of age and relative inexperience play into this? I think in determining whether conduct, harassing conduct is sufficiently severe or pervasive, you know, the court, the court's cases instruct that you consider the totality of the circumstances. So, if from an objective and or a subjective perspective, the age differential might play into whether conduct could be perceived as abusive or hostile, then it becomes a factor. Maybe it's a subjective factor, but falls out at the objective stage or something like that. I think that's right, Your Honor. I mean, from an— What's your best case for that? I think there are two. I think there is the Kumar case where this gentleman has carpal tunnel, he's needing accommodation to deal with that disability, and there are basically some delays around providing him with an accommodation. One of his supervisors gets angry when he asks about an accommodation, and he's also just subject to some ordinary, unrelated discipline. I think the other case—and I may butcher this pronunciation—is the Department of Housing and Urban Development. In that case, a Hispanic employee alleged discrimination based on complaints made about how he behaved inappropriately in meetings and had been verbally abusive. He received some low-performance evaluations, and on one occasion, a supervisor referred to him as Che Guevara, and then another called him an aggressive Hispanic. And in that case, this court said that the plaintiff's subjective perception of the hostile work environment, which is a fact issue on the hostile work environment claim, because there needs to be evidence of the objective component and the isolated kind of relatively minor—not to say that it's not somewhat offensive or somewhat demeaning, but relatively minor incidents in the workplace were not going to be enough. Talk a little bit about the remedial measures. I mean, in the briefs, you talk about it being an element of the hostile work environment claim, but in reality, we've got a supervisor here, so I don't—is it an affirmative defense, or is it an element that the plaintiff bears proof? Your Honor, I think I will leave my thoughts on that to our briefing and just say that, you know, that's not a ground that the court needs to consider to affirm the district court. You can affirm the district court simply on the district court's conclusion that this isolated incident was not severe enough. I do believe that most of the evidence here is uncontroverted in terms of immediately after this incident, Ms. Navarette goes to Mr. Mosher and says, that was not right. Was it an affirmative defense that you bore the burden on? Is it preserved? Was it made? Your Honor, I think the evidence is sufficient to support the affirmative defense. Was it asserted? You have to assert an affirmative defense to have it. I unfortunately do not recall if we pleaded that defense in the record, but it certainly is in there in our answer, or the court could certainly find it in our answer if we did plead it. I can't recall offhand on that issue. I do want to spend just a few minutes talking about the constructive discharge claim. The district court, I think, correctly said, and this court said also in the Viseo case, that a constructive discharge claim is an aggravated hostile work environment, is essentially an aggravated case of a hostile work environment. So a plaintiff who advances that kind of claim needs to show working conditions so intolerable that a reasonable person would have felt compelled to resign. This is just a purely objective claim. It's a purely objective reasonable person test and requires a greater degree of harassment than even the hostile work environment claim. So the factors the court considers, demotion, reduction in salary, reduction in job responsibilities, reassignment to menial or degrading work, badgering calculated to encourage resignation, and offers of early retirement. Mr. Calasado was like a 20-year-old guy at the time. Offers of retirement weren't really on the table, but . . . Wasn't he badgered to quit? That's not . . . I don't think that is a fair characterization of Mr. Moser's testimony. He . . . or Mr. Moser's statement in the transcript. A little bit back to Judge Southwick's point, that sounds like a fact issue. Your Honor, just because I think we may be talking in terms of characterizations here, Mr. Calasado was not encouraged to quit. He was not told he had to quit. This was all in the totality of the circumstances of this conversation. It was one heated comment that clearly moved on. Mr. Moser was not trying to make Mr. Calasado quit. They ultimately did accommodate him because they, I think, wanted him to stay. And certainly Ms. Navarette makes that point in the conversation. Hey, are we good? Do you feel protected at the end of that conversation? And Mr. Calasado says he did. Like I said before, he got exactly the accommodation he asked for and more. And that he even admitted in his deposition that he was not forced to resign due to the failure to accommodate request. And he also says that he didn't resign because of the harassment. He resigned, he said, because there had been some unrelated disagreements with Mr. Moser in the past and he just was kind of over the whole thing. So in the absence of evidence for any of those factors, I think the district court properly dismissed the constructive discharge claim. And if the court has no other questions, I've reached the end of my outline. We'll take your time back. Okay. Enjoy the four minutes. And just for these reasons that we asked for the court to affirm the district court's judgment. Thank you. Thank you. And the EEOC knows it doesn't get the four minutes. It's very disappointing, Your Honor. I just wanted to make a few comments based on my colleague's arguments there. First, she says it's not based on disability. It's absolutely based on disability. There was the disability that led to the accommodation request. The accommodation request then led to the harassment. It's a direct through line causally. If they want to point to something else that caused it, at best it's a fact issue, but not appropriate for a decision on summary judgment. Second, they say that he was accommodated. Again, that's irrelevant. The question is whether he was harassed because of the accommodation request. So it's irrelevant whether or not they ultimately changed their policy for everybody. The question is whether he was harassed based on his request for an accommodation that he felt was necessary. Your Honor, I think had some questions about youth and whether that matters for understanding how this was perceived. But in on-call, the Supreme Court said you need to look at how a reasonable person in the target's position would have perceived the harassment. And somebody's youth and inexperience is inextricably bound within that. Now, it's not saying that a 30-year-old is more sensitive than a 40-year-old, but certainly somebody who is in his teens or just out of his teens in his first paying job out of high school could feel more intimidated and more frightened, more threatened by what happened here. How are they ever going to learn? My son is exactly this age and he's working in his first jobs. How are they ever going to learn when they get disciplined by a supervisor if they can't be disciplined by a supervisor or if we're just looking at it from their perspective, brand new employee? I mean, that's part of the perspective. There's also a reasonableness component to it, Your Honor. And that goes to the totality of the circumstances. It goes, exactly, it goes to the totality. That's the subjective part but not the objective part. It goes to the totality and it helps understand what would be considered particularly frightening. But of course, somebody who doesn't want to be criticized in anything they do, that doesn't That's a completely separate inquiry here. Your Honor mentioned the idea of an eggshell skull plaintiff, but eggshell skull is, as the district court found, this was no eggshell skull plaintiff. This was somebody who had a reasonable belief that his health and possibly life was threatened based on needing to work with an infected population and in response to trying to get that accommodated, was subject to this harassment. They mentioned the Kumar case and I just point out a few points about that. It's not a published case of this circuit and the question there was whether his employers had some questions about whether he was actually disabled. They, and he objected to them giving him job counseling and making comments about the possibility of harassment that was experienced here. And again, that's not a published decision. With respect to, I couldn't tell which of the, which other case the opposing counsel mentioned, but I don't believe it was in their brief. But if I'm incorrect about that, I welcome your Honor's questions about the case they were referring to. Moving on, with respect to the affirmative defense, again, they need to prove every aspect of the affirmative defense. So apparently there, they will argue there's some factual question about any sort of corrective measures that were taken. That's, I think doesn't pass the laugh test, but even if it did, that's only one aspect of it. And they certainly didn't have any anti-harassment, anti-discrimination policies in place in a way that's required in order to make out an affirmative defense under Pollan and under Bowe Brothers. Let's see. I see my time is up. If I could just respond to the constructive discharge. Thank you, Your Honor. They say that he, that it was really this other set of what he called little things that led to the, him quitting. He quit four hours after this took place. And he said, he testified that it was because he felt scared, degraded, and humiliated afterwards. So at the very least, it's a question of fact for the jury, whether it was the harassment that led to the constructive discharge. But I think frankly, it's hard to understand it as anything else. All right, counsel. Thank you. Thank you very much, Your Honor. Thanks to both of you for bringing your points of view on this case and answering our questions.